# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51098-7-II |
| Respondent, | |
| v. | |
| JEREMIAH ALLEN TEAS, | PUBLISHED OPINION |
| Appellant. | |

LEE, J. — Jeremiah A. Teas appeals his conviction for first degree rape by forcible compulsion, arguing that (1) the prosecutor engaged in numerous instances of misconduct, (2) the trial court abused its discretion in refusing to give his requested consent instruction, and (3) his sentence under Washington's Persistent Offender Accountability Act (POAA) constitutes cruel punishment under article I, section 14 of the Washington Constitution. We disagree and affirm.

FACTS

A. THE RAPE AND INVESTIGATION

R.C.[1] posted an advertisement offering massage services under the "Escorts" category of an online forum. 3 Verbatim Report of Proceedings (VRP) (Sept. 12, 2017) at 287. Teas, who was 39 years old at the time, responded to the advertisement and arranged for R.C. to give him a

---

[1] We use the victim's initials to protect her privacy.

massage at R.C.'s apartment. When Teas arrived at R.C.'s apartment, she led him into her bedroom and closed the door behind them. R.C. bent over to place her cellphone on the bedside table, at which point, Teas jumped on her back, held a pocketknife blade to her throat, and said he was going to rape her.

R.C. told Teas that she would "do whatever he wanted" if he put the blade away. 3 VRP (Sept. 12, 2017) at 297. Teas put the blade away and had sexual intercourse with R.C. for a couple of minutes. Teas had difficulty maintaining an erection, so R.C. suggested that she get lubricant to help. Teas agreed, and R.C. walked toward the bedroom door. Teas intercepted R.C. at the bedroom door and instructed her not to leave the bedroom. R.C. struggled with Teas at the door, pushed the door open, and ran screaming toward her roommate's bedroom. R.C. hid in her roommate's bedroom until R.C. looked out the window and saw Teas exiting the front of her apartment building. R.C. contacted law enforcement.

Teas left his knife and hat in R.C.'s bedroom. The knife handle later tested positive for both R.C.'s and Teas's deoxyribonucleic acid (DNA) profiles. A sample swab of the hat also matched Teas's DNA profile. And samples taken from stains found on R.C.'s bedsheets matched Teas's DNA profile. The samples taken from R.C.'s bedsheets tested negative for the presence of blood. Law enforcement later detained Teas, and he claimed that he was nowhere near R.C.'s apartment but was only in the area visiting a friend.

B.       RELEVANT PORTIONS OF TRIAL

        1.       Witness Testimony

The State charged Teas with one count of first degree rape by forcible compulsion.  At trial, R.C., law enforcement, including Deputy Richard Osborne of the Clark County Sheriff's Office, and a forensic scientist with the Washington State crime laboratory testified to the facts discussed above.

R.C. testified that after Teas put his knife away, he asked her to kiss him and perform oral sex on him.  R.C. said no to both requests.  On cross-examination, R.C. admitted that she was not a licensed massage therapist.

The sexual assault examination nurse who examined R.C. testified that R.C. told her the same facts detailed above, except R.C. told her that Teas suggested the lubricant, not R.C.

Teas also testified and denied having sexual intercourse with R.C.  According to Teas, he only expected to receive a "happy ending" massage from R.C.  5 VRP (Sept. 13, 2017) at 673. Teas stated that R.C. had asked him to take off his pants, and that he pulled them down to his mid-thigh.  R.C. then "proceeded to take off her pants that she was wearing."  5 VRP (Sept. 13, 2017) at 657.  Teas asked R.C. if she would kiss him or perform oral sex on him.  R.C. said no to both requests.  Teas "was trying—having some problems trying to become erect and she had said, 'Well, we need to have a condom on because I am not on any birth control.'"  5 VRP (Sept. 13, 2017) at 658.  R.C. then gave Teas a condom that she had stored in the desk next to her bed.  Teas still had difficulty maintaining an erection, and R.C. "proceeded to ask if she could get some lube, hence, ask for a penis pump to help [him] become erect because [he] was having trouble[] with it."  5

VRP (Sept. 13, 2017) at 658. At this point, he reached into his pocket to give R.C. money and accidentally displayed the knife he had kept in his pocket. R.C. ran away screaming at the sight of the knife, and Teas quickly left the apartment.

On cross-examination, Teas repeatedly denied that he expected to receive any service other than a massage from R.C. He also claimed that the two never had sexual intercourse because he was unable to maintain an erection.

2.      Request for Consent Instruction

At the close of evidence, Teas proposed a jury instruction on consent. The trial court found that the evidence at trial did not support the instruction because Teas claimed that sexual intercourse never occurred, not that it was consensual and denied Teas's request to include a consent instruction.

3.      Opening Statement and Closing Argument

During opening statement, the prosecutor stated, "The DNA from the blood stain on [R.C.]'s bed matched the defendant's DNA." 2 VRP (Sept. 11, 2017) at 196. In closing, the State argued that R.C.'s version of what happened between her and Teas had "been consistent from the very beginning" in what she told police, the sexual assault examination nurse, and defense counsel. 6 VRP (Sept. 14, 2017) at 724. And the State argued that the jury could conclude from this consistency that R.C. did not fabricate the details of what happened.

Later, in discussing Teas's knife, the prosecutor argued:

> Now, it is not a gun. It's not a firearm. It's not a pistol, a revolver, because those are, per se, deadly weapons. Okay? But the manner in which this instrument, this implement was used, with either blade, and the proximity to a person's neck, constitutes a deadly weapon.

No. 51098-7-II

And we know that something like this has been used in the past. Okay? I'm not saying—what I'm about to say, and I will preface this by saying this is not a terrorist act. This is not even close to 9/11. Okay? But we all know what was reported about the people who meant to harm on—on those planes that crashed into the—the twin towers. What did they have? Box cutters.

This, ladies and gentleman, with this blade exposed, the manner in which it was used, is a deadly weapon.

6 VRP (Sept. 14, 2017) at 735-36.

The State also argued that all of the DNA evidenced placed Teas in R.C.'s bedroom. The State then argued that Teas's testimony "defie[d] logic" and "ma[de] no sense" because Teas told the police he was nowhere near R.C.'s apartment. 6 VRP (Sept. 14, 2017) at 733.

So that's another reason why, ladies and gentlemen, the defendant decided to testify. He saw the overwhelming evidence against him. Couldn't deny the DNA. Could not deny the DNA.

. . . .

. . . Again, the estimated probability of selecting an unrelated individual at random in the U.S. population with a matching profile is 1 in 130 quintillion. These are things that the defendant cannot dispute, cannot rebut. And so that's why he got on the stand yesterday and came—came up with a story to try and explain away what happened. And he wrapped up some of the things that have been proved to be true. For example, his presence there, because he can't deny that he wasn't there because he was. But he had to explain why and how and then deny that he was able to engage in sexual intercourse.

6 VRP (Sept. 14, 2017) at 747-48.

Teas did not object to any portion of the State's closing argument. The jury found Teas guilty as charged.

5

C.      SENTENCING

Teas had a prior conviction for first degree child molestation.  The record shows that this crime was committed sometime between July 1994 and September 1996, when Teas was between the ages of 17 and 19.  Based on his prior conviction of first degree child molestation, the court sentenced Teas to life in prison without the possibility of release under Washington's Persistent Offender Accountability Act (POAA).[2]

Teas appeals.

ANALYSIS

A.      PROSECUTORIAL MISCONDUCT

Teas argues that his conviction must be reversed because of prosecutorial misconduct. Teas asserts that the prosecutor committed misconduct by (1) directly commenting on Teas's exercise of his constitutional right to testify, (2) comparing Teas's knife to the weapon used in the 9/11 terrorist attacks, (3) referencing facts not in evidence, and (4) and vouching for R.C.'s credibility.  We disagree that the prosecutor's conduct requires reversal.

1.      Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial.  *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).  The effect of a prosecutor's conduct is viewed in "'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given

---

[2] RCW 9.94A.570.

to the jury.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotations omitted) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

We first determine whether the prosecutor's conduct was improper. *Emery*, 174 Wn.2d at 759. If the prosecutor's conduct was improper, then the question turns to whether the prosecutor's improper conducted resulted in prejudice. *Id.* at 760. Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict. *Id.*

If the defendant fails to object to the prosecutor's remarks at trial, he or she "is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id.* at 760-61. Under this heightened standard of review, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). In making this determination, we focus on whether the resulting prejudice could have been cured. *Id.* at 762.

### 2. Exercise of Constitutional Right to Testify

Teas argues that the prosecutor committed misconduct by creating an inference of guilt based on Teas's exercise of his right to testify during closing argument. Specifically, Teas asserts that the prosecutor improperly impugned guilt upon Teas, thus violating his constitutional right to testify on his own behalf under article I, section 22 of the Washington Constitution, when the prosecutor argued in closing argument that (1) Teas testified in order to explain the presence of

DNA found in R.C.'s apartment and (2) Teas tailored his testimony to fit with the evidence presented at trial.

    a.  Standard of review

As an initial matter, the parties dispute whether the waiver standard articulated in *Emery* applies here because Teas did not object to the prosecutor's comments at trial. Teas contends that this assignment of error is not subject to the heightened waiver standard articulated in *Emery* because it directly violated a constitutional right. According to Teas, whenever a prosecutor's improper comments violate a constitutional right, we solely consider prejudice and apply the constitutional harmless error standard. The State argues that the waiver standard articulated in *Emery* is still applicable here. We agree with the State.

It is true that the constitutional harmless error standard applies when a prosecutor's improper comments directly violate a constitutional right. *State v. Espey*, 184 Wn. App. 360, 369, 336 P.3d 1178 (2014); *Emery*, 174 Wn.2d at 757. However, a prosecutorial misconduct claim of this nature does not render the framework articulated in *Emery* wholly inapplicable. Teas's argument ignores that we have previously assessed waiver in the context of direct constitutional claims involving prosecutors' improper comments. *See, e.g.*, *Espey*, 184 Wn. App. at 366; *State v. Pinson*, 183 Wn. App. 411, 419, 333 P.3d 528 (2014).

In *Espey*, we considered whether the prosecutor had improperly commented on the defendant's right to counsel by urging the jury to infer that the defendant was lying because he had consulted with an attorney prior to arrest. 184 Wn. App. at 368-69. Before applying the constitutional harmless error standard in *Espey*, we employed the framework articulated in *Emery*

to determine whether the defendant had waived the error by failing to object. *Id.* Similarly, in *Pinson*, we considered whether the defendant had waived his prosecutorial misconduct claim when he failed to object to the prosecutor's express and deliberate comments that his post arrest silence evidenced guilt. 183 Wn. App at 419.

Thus, contrary to Teas's argument, the framework articulated in *Emery* is still applicable. If we determine that the prosecutor's comments here were improper, Teas is deemed to have waived the error unless he can show that the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *See Emery*, 174 Wn.2d at 760-61.

### b.  Argument on why Teas testified

Teas argues that the prosecutor impermissibly commented on his exercise of the right to testify when the prosecutor argued that Teas testified in order to explain the DNA evidence in the case. We hold that Teas waived this error because he fails to show that the prosecutor's comments were so flagrant and ill intentioned that the resulting prejudice could not have been cured.

A criminal defendant's right to testify is expressly protected under article I, section 22 of the Washington Constitution. This right is fundamental, and it may not be impaired by counsel or the court. *State v. Robinson*, 138 Wn.2d 753, 758, 982 P.2d 590 (1999). When a defendant decides to testify, the State may not draw adverse inferences from the exercise of that right. *State v. Rupe*, 101 Wn.2d 664, 705, 683 P.2d 571 (1984). Therefore, it is improper for the State to speculate as to why a defendant testified to infer guilt.

Here, the State argued that Teas testified because "He saw the overwhelming evidence against him. Couldn't deny the DNA. . . . And so that's why he got on the stand . . . and came— came up with a story to try and explain away what happened." 6 VRP (Sept. 14, 2017) at 747-48. By speculating as to the reason Teas testified, the State inferred that Teas knew he was guilty based on the evidence and testified so he could make up a story to try and explain away what happened. This was improper.

Nonetheless, we hold that the prosecutor's comments here was not so flagrant and ill intentioned that the resulting prejudice could not be cured with a jury instruction. As explained above, Teas failed to object to this line of argument. And Teas makes no effort to meet the heightened standard of review articulated in *Emery*. Instead, Teas argues that because his credibility was central to the case, "the prosecutor's comments undoubtedly prejudiced him." Br. of Appellant at 23. We also note that the prosecutor attempted to couch the argument around what the evidence at trial showed. Therefore, even if the prosecutor's remarks resulted in some prejudice, it cannot be said that the remarks were so flagrant and ill intentioned that the resulting prejudice could not have been cured through an instruction to disregard them. Thus, we hold that Teas waived this error by failing to object to the prosecutor's comments below.

c. Tailoring argument

Teas also contends that the prosecutor impermissibly suggested in closing argument that Teas had tailored his testimony to conform to the evidence presented at trial. Teas relies on *State v. Martin*, 171 Wn.2d 521, 252 P.3d 872 (2011), to argue that general tailoring arguments made during closing argument violate article I, section 22 of the Washington Constitution.

In *Martin*, our Supreme Court addressed whether a prosecutor may question a defendant during cross-examination in a way that suggests that the defendant tailored his testimony to conform to the evidence presented at trial. 171 Wn.2d at 533-34. The *Martin* court held that questions suggesting tailoring of testimony during cross-examination of a defendant were compatible with the Washington Constitution, based in part, on the view articulated by Justice Ginsburg's dissent in *Portuondo v. Agard*, 529 U.S. 61, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000). 171 Wn.2d at 535-36. The *Martin* court stated that "[i]t is during cross-examination, not closing argument, when the jury has the opportunity to determine whether the defendant is exhibiting untrustworthiness." *Id.* at 536. Teas relies on this language in *Martin* to argue that a prosecutor may not argue in closing—as opposed to raising the issue during cross-examination—that the defendant had tailored his testimony.

However, in *Martin*, the court did not decide whether tailoring arguments made during closing argument were compatible with the Washington Constitution. The court specifically noted that "the majority and dissent in *Portuondo* agreed that generic accusations of tailoring are permissible" although "there was disagreement about whether such accusations are permitted during closing argument." *Martin*, 171 Wn.2d at 536, n. 8. The court expressly declined to decide whether generic tailoring accusations were prohibited under article I, section 22 because the accusations of tailoring in that case were specific, not generic. *Id.*

Following *Martin*, Division One of this court rejected the same argument that Teas now makes based on *Martin*. *State v. Berube*, 171 Wn. App. 103, 116, 286 P.3d 402 (2012), *review denied*, 178 Wn.2d 1002 (2013). The court in *Berube* noted that *Martin* had expressly declined to

address generic tailoring arguments. *Id.* The court further held that "the evil addressed in *Martin* is a closing argument that burdens the exercise of constitutional rights without an evidentiary basis and in a fashion preventing the defendant from meaningful response." *Id.* at 116-17. However, "[w]hen tailoring is alleged based on the defendant's testimony on direct examination, the argument is a logical attack on the defendant's credibility and does not burden the right to [] testify." *Id.* at 117. We agree with *Berube*.

Here, when viewed in the context of the entire closing, the prosecutor did not make a general tailoring argument. Teas's trial testimony differed substantially from the statement he made to law enforcement. He told law enforcement that he was nowhere near R.C.'s apartment, and instead was in the area visiting a friend. At trial, Teas made a different statement and admitted that he had arranged for a massage with R.C. and was in her apartment that afternoon. Thus, the prosecutor's argument was based on the change in Teas's testimony from his initial statements, which was the type of argument that the *Berube* court approved. *See Id.* at 116-17. Teas fails to establish prosecutorial misconduct on this basis.

3.      9/11 Weapon Argument

Teas argues that the prosecutor impermissibly appealed to the passions and prejudice of the jury when he likened Teas's knife to the weapon used during the terrorist attacks on September 11, 2001. We agree that the argument was improper, but we hold that it was not so flagrant and ill intentioned that it resulted in incurable prejudice.

An appeal to the passion and prejudice of the jury through use of inflammatory rhetoric is improper. *In re the Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). "A

prosecutor is not barred from referring to the heinous nature of a crime but nevertheless retains the duty to ensure a verdict 'free of prejudice and based on reason.'" *State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012) (quoting *State v. Claflin*, 38 Wn. App. 847, 849-50, 690 P.2d 1186 (1984), *review denied*, 103 Wn.2d 1014 (1985)), *review denied*, 175 Wn.2d 1025 (2012). And though the State has wide latitude to argue reasonable inferences from the evidence, it is misconduct for a prosecutor to urge the jury to decide a case based on evidence outside the record. *Id.*

Teas argues that the prosecutor impermissibly appealed to the passion and prejudice of the jury and referenced facts not in evidence when he compared his pocketknife to the weapon used in the 9/11 terrorist attacks. We agree that this argument was improper.

Contrary to the State's argument, referencing the destruction of the World Trade Center in the deadliest terrorist act to ever occur on American soil is more than "potentially ill-advised." Br. of Resp't at 30. It is a blatant appeal to the passion and prejudice of the jury. However, when viewed in the context of the total argument, the evidence, issues in the case, and instructions provided to the jury, we hold that the prosecutor's remarks were not so flagrant and ill intentioned that the resulting prejudice could not have been cured with a jury instruction.

The prosecutor referenced the 9/11 terrorist attacks in the context of discussing the deadly weapon instruction and explaining that an item may constitute a deadly weapon depending on the manner in which it is used. The prosecutor did not use the 9/11 terrorist attacks as a central theme in closing argument and explicitly stated that he was not likening Teas's conduct to a terrorist attack. Viewed in context, the statements were not so flagrant and ill intentioned that the resulting

prejudice could not have been cured with a curative instruction. Because Teas failed to object below and cannot meet this heightened standard, he has waived his prosecutorial misconduct claim on this basis.

     4.     Arguing Facts Not In Evidence

Teas also argues that the prosecutor engaged in flagrant misconduct by arguing facts not in evidence. Specifically, Teas argues that the prosecutor argued facts not in evidence when he (1) referenced a blood stain found on R.C.'s bedsheets during opening statement, (2) claimed during closing argument that R.C.'s version of events had been consistent in order to bolster her credibility, and (3) referenced a witness who never testified at trial.

Again, Teas did not object to any of these remarks at trial. Therefore, he has waived any error unless he can show that the prosecutor's misconduct was so flagrant and ill intentioned that the resulting prejudice could not have been cured with a jury instruction. *See Emery*, 174 Wn.2d at 760-61.

First, Teas argues that the prosecutor's reference to a bloodstain containing Teas's DNA during opening statement was improper because it was unsupported by the evidence at trial. It is true that the evidence at trial showed that the sample taken from R.C.'s bedsheets tested negative for the presence of blood. However, the prosecutor's reference to a bloodstain was made during opening statement. A witness's expected testimony is a permissible subject for opening statement. *Thorgerson*, 172 Wn.2d at 444. Because the prosecutor's opening statement only concerned evidence that the State anticipated presenting at trial, the prosecutor's reference to the bloodstain was not improper.

Next, Teas contends that the prosecutor improperly vouched for R.C.'s credibility during closing argument when the prosecutor argued that R.C.'s story had been consistent. We disagree.

"Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." *Id.* at 443. And a prosecutor may not state a personal belief as to the credibility of a witness. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010).

Teas asserts that the prosecutor's argument that R.C.'s story had been consistent was "patently false" because the detail of who suggested the lubricant had changed with each retelling, as did the detail of whether Teas jumped on R.C.'s back or shoved her onto the bed. Br. of Appellant at 29. However, Teas acknowledges that in each retelling, R.C. claimed that Teas held a knife to her throat, said he was going to rape her, and had sexual intercourse with her. We find that the details as to who suggested lubricant and whether Teas jumped on or pushed R.C. do not render the prosecutor's statement that R.C.'s version of events was consistent "patently false."

Finally, Teas asserts that the prosecutor argued facts not in evidence when he referenced Deputy Osborne's testimony because Deputy Osborne never testified at trial. We disagree.

A prosecutor commits misconduct by encouraging the jury to decide a case based on evidence outside the record. *Pierce*, 169 Wn. App. at 553. However, contrary to Teas's assertion, Deputy Osborne testified in detail regarding his involvement in R.C.'s case. Therefore, the prosecutor did not commit misconduct by referencing Deputy Osborne's testimony during closing argument.

B.    CONSENT INSTRUCTION

Next, Teas argues that the trial court erred when it refused to provide his proposed jury instruction on consent because there was evidence that the sexual intercourse was consensual. We disagree.

1.    Legal Principles

A criminal defendant is entitled to have the trial court instruct the jury upon the theory of his or her case so long as there is evidence in the record that supports the theory. *State v. Fisher*, 185 Wn.2d 836, 848, 374 P.3d 1185 (2016). Refusal to give a requested jury instruction constitutes reversible error when the absence of the instruction prevented the defendant from arguing his or her theory of the case. *State v. Buzzell*, 148 Wn. App. 592, 598, 200 P.3d 287, *review denied*, 166 Wn.2d 1036 (2009).

We review de novo the trial court's refusal to give a proposed jury instruction when the refusal is based on a ruling of law. *State v. Ayala Ponce*, 166 Wn. App. 409, 416, 269 P.3d 408 (2012). We review the refusal for an abuse of discretion where refusal is based on lack of evidentiary support. *State v. Harvill*, 169 Wn.2d 254, 259, 234 P.3d 1166 (2010). Under this standard of review, we will not reverse the trial court's ruling "unless it was manifestly unreasonable or based on untenable grounds or reasons." *State v. Robinson*, 193 Wn. App. 215, 217-18, 374 P.3d 175 (2016). A trial court necessarily abuses its discretion when its ruling is based on an erroneous view of the law. *Harvill*, 169 Wn.2d at 259.

2.      Consent Instruction Not Required for First Degree Rape

Teas argues that the trial court's refusal to give his proposed consent instruction was manifestly unreasonable because it prevented him from arguing his theory of the case and there was "more than enough evidence" of consent here. Br. of Appellant at 34. We disagree.

A person is guilty of first degree rape when that person "engages in sexual intercourse with another person by forcible compulsion." RCW 9A.44.040(1). "'Consent' means that at the time of the act of sexual intercourse or sexual contact there are actual words or conduct indicating freely given agreement to have sexual intercourse or sexual contact." RCW 9A.44.010(7). Consent negates the element of forcible compulsion. *State v. W.R.*, 181 Wn.2d 757, 763, 336 P.3d 1134 (2014).

Once a defendant asserts consent as a defense and provides sufficient evidence to support the defense, the State must prove lack of consent as part of its burden of proof on the element of forcible compulsion. *Id.* This is because "[a]s defined, forcible compulsion contemplates force that overcomes actual resistance or threats that place a person in actual fear. There can be no forcible compulsion when the victim consents, as there is no resistance to overcome." *Id.* at 765. In *W.R.*, our Supreme Court specifically noted that "[b]ecause the focus is on forcible compulsion, jury instructions need only require the State to prove the elements of the crime. It is not necessary to add a new instruction on consent simply because evidence of consent is produced." *Id.* at 767, n. 3.

Thus, under *W.R.*, the trial court was not required to provide a consent instruction here because the State was already required to prove lack of consent as part of its burden of proof on

the element of forcible compulsion. Moreover, even without the proposed instruction, Teas was still able to argue his theory that there was consent to engage in sexual intercourse. Therefore, we hold that the trial court did not err in refusing to give Teas's proposed consent instruction.

C. CUMULATIVE ERROR

Teas argues that the cumulative effect of the prosecutorial misconduct and the refusal to give his consent instruction resulted in a trial that was fundamentally unfair. We disagree.

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. This doctrine does not apply when the defendant fails to establish how the claimed instances of prosecutorial misconduct affected the outcome of the trial or how combined claims of misconduct affected the outcome of the trial. *Thorgerson*, 172 Wn.2d at 454.

Here, although the prosecutor made improper comments, Teas fails to show how either, or both, instances of misconduct affected the outcome of the trial. Teas also fails to show that the errors rendered his trial fundamentally unfair. Thus, we hold that Teas is not entitled to a new trial based on the cumulative error doctrine.

D. CRUEL AND UNUSUAL PUNISHMENT

Finally, Teas argues that his mandatory sentence under the POAA of life without possibility of release violates Washington's Constitution; specifically, article I, section 14's prohibition against cruel punishment. He argues that this provision of the Washington Constitution categorically bars imposition of a sentence to life without possibility of parole on adult offenders who committed a predicate offense under the POAA as a youth. We disagree.

1. Standard of Review

Whether a statute is constitutional is a question of law that we review de novo. *State v. Moen*, 4 Wn. App. 2d 589, 598, 422 P.3d 930 (2018), *review denied*, 192 Wn.2d 1030 (2019). We presume that a statute is constitutional, and the party challenging the statute bears the burden of proving it is unconstitutional beyond a reasonable doubt. *Id.*

2. Teas's Sentence Does Not Violate Article I, Section 14

Article I, section 14 of the Washington Constitution bars "'cruel punishment.'" *Id.* (quoting *State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014)). Its federal counterpart, the Eighth Amendment to the United States Constitution, prohibits cruel and unusual punishment. *Id.* In the context of juvenile sentencing, Washington's constitutional provision provides greater protection than the Eighth Amendment. *State v. Bassett*, 192 Wn.2d 67, 82, 428 P.3d 343 (2018).

Our Supreme Court recently held that sentencing juvenile offenders to life without parole or early release constitutes cruel punishment in violation of article I, section 14 of the Washington Constitution. *Id.* at 91. This holding was based on the national trend toward "abandoning juvenile life without parole sentences," and the considerable scientific research showing that "the characteristics of youth do not support the penological goals of a life without parole sentence." *Id.* at 90.

Teas argues that the framework articulated in *Bassett* compels us to hold that it is cruel to sentence an adult as a persistent offender under the POAA when that adult committed one of his predicate offenses as a youth. We disagree.

As an initial matter, Teas's argument confuses categorical bar challenges and as applied challenges. He asks us to conduct categorical bar analysis, but he simultaneously characterizes his challenge as an "as-applied challenge" to individuals like him as a "category." Br. of Appellant at 48.

The standard for assessing an as-applied challenge to a defendant's sentence is articulated in *State v. Fain*, 94 Wn.2d 387, 617 P.2d 720 (1980). In *Fain*, the defendant argued that his sentence under the habitual criminal statute was disproportionate to the nature of his crimes. *Id.* at 390-91. *Fain* outlined four factors that courts are to consider when determining whether a defendant's sentence is proportional to the nature of his crimes: "(1) the nature of the offense; (2) the legislative purpose behind the habitual criminal statute; (3) the punishment [the] defendant would have received in other jurisdictions for the same offense; and (4) the punishment meted out for other offenses in the same jurisdiction." *Id.* at 397.

Teas does not challenge the proportionality of his sentence given the particular circumstances of his crime. Instead, he argues that it is unconstitutional to sentence a class of defendants, adults who committed a predicate offense under the POAA as a "youth," to mandatory life imprisonment. Br. of Appellant at 48. Therefore, even though Teas frames his challenge as "an as-applied challenge" to individuals like him, Teas raises a categorical bar challenge here.[3] Br. of Appellant at 48.

---

[3] Teas also argues in the alternative, that if we do not apply categorical bar analysis, we should adopt a new "*Fain+*" standard that accounts for a defendant's youth. Br. of Appellant at 53. He argues that this new test is necessary because the traditional *Fain* test fails to account for a youthful offender's diminished culpability. We decline to adopt Teas's proposed test.

In assessing a categorical bar challenge, we consider "(1) objective indicia of society's standards to determine whether there is national consensus against sentencing those [of a particular class] to mandatory life imprisonment and (2) our own understanding of the prohibition of cruel punishment." *Moen*, 4 Wash. App.2d at 601. This second step requires this court to consider "'the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question' and 'whether the challenged sentencing practice serves legitimate penological goals.'" *Bassett*, 192 Wn.2d at 87 (quoting *Graham v. Florida*, 560 U.S. 48, 67, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)).

Teas does not provide any legislative enactments or state practices regarding use of "youthful crimes" as predicate offenses under habitual offender statutes. Br. of Appellant at 50. Recently, our Supreme Court held that "Article I, section 14 of the Washington Constitution does not require a categorical bar on sentences of life in prison without the possibility of parole for fully developed adult offenders who committed one of their prior strikes a young adults." *State v. Moretti*, No. 95263-9 slip op. at 2 (Wash. Aug. 15, 2019)[4]. And review of other jurisdictions' statutes and case law does not show a national consensus against sentencing adults as persistent

---

Teas's proposal is a misguided attempt to blur the frameworks for analyzing categorical bar and as-applied challenges. And it fails to appreciate the nature and purpose of the *Fain* framework. The *Fain* framework weighs the nature of a particular offense with its resulting punishment. *Bassett*, 192 Wn.2d at 83. This analysis informs whether the punishment is disproportionate to the particular circumstances of a defendant's crime. *Moen*, 4 Wn. App.2d at 600. Thus, the *Fain* framework is *"ill suited"* to analyze "a categorical challenge based on the characteristics of the offender class." *Bassett*, 192 Wn.2d at 83. Indeed, the very policy Teas hopes to advance through his proposed test—considering the characteristics of the offender class—is the precise reason the categorical bar analysis applies here.

[4] http://www.courts.wa.gov/opinions/pdf/952639.pdf

offenders when their predicate offenses were "youthful." Rather, several jurisdictions have rejected this very argument. *Wilson v. State*, 2017 Ark. 217, 521 S.W.3d 123; *Commonwealth. v. Bonner*, 135 A.3d 592 (Pa. Super. Ct. 2016); *Vickers v. State*, 117 A.3d 516 (Del. 2015); *Counts v. State*, 2014 WY 151, 338 P.3d 902.

Moreover, we hold that punishing an adult as a persistent offender when a predicate offense was youthful does not contradict the penological goals of the POAA. The POAA requires superior court judges to sentence persistent offenders to life in prison without the possibility of release. RCW 9.94A.570. A "persistent offender" includes someone who has been convicted of first degree rape, and has on at least one occasion been convicted of first degree child molestation. RCW 9.94A.030(38)(b)(i), (ii)[5]. An "offender" means a person who has committed a felony and is eighteen years of age or older. RCW 9.94A.030(35).

"The purpose of the POAA is the segregation of persistent offenders from the rest of society, generally deterring others." *State v. Hart*, 188 Wn. App. 453, 461, 353 P.3d 253 (2015). As the Tenth Circuit has explained, "Unlike defendants who receive severe penalties for juvenile offenses . . . recidivists have been given an opportunity to demonstrate rehabilitation, but have elected to continue a course of illegal conduct." *United States v. Orona*, 724 F.3d 1297, 1308 (10th Cir.), *cert. denied*, 571 U.S. 1034 (2013). Punishing an adult for continuing to commit violent crimes after being given the chance for rehabilitation supports the penological goal of separating repeat offenders from the rest of society.

---

[5] RCW 9.94A.030 has been amended since the events of this case transpired. Because the amendments do not materially affect the statutory language relied on by this court, we refrain from including the word "former" before RCW 9.94A.030.

No. 51098-7-II

Our courts have recognized that "children are less criminally culpable than adults, and the characteristics of youth do not support the penological goals of a life without parole sentence." *Bassett*, 192 Wn.2d at 90. However, Teas is not a juvenile being punished for a crime he committed as a juvenile. He was 39 years old when he raped R.C. by forcible compulsion. Therefore, the mitigating factors of youth were not applicable when he was sentenced for this crime. Teas's constitutional challenge to his sentence fails.

CONCLUSION

We hold that Teas's prosecutorial misconduct challenges fail, the trial court did not err when it refused to provide his proposed jury instruction on consent, there was no cumulative error necessitating reversal, and his constitutional challenge to his mandatory sentence to life without possibility of parole fails. Accordingly, we affirm.

_____
Lee, J.

We concur:

_____
Worswick, J.

_____
Maxa, C.J.

23